630 So.2d 165 (1993)
A.D.T.
v.
STATE.
CR 92-1455.
Court of Criminal Appeals of Alabama.
December 3, 1993.
*166 Dennis Stevenson, Tuscaloosa, for appellant.
James H. Evans, Atty. Gen., and Gilda Williams, Asst. Atty. Gen., for appellee.
BOWEN, Presiding Judge.
The appellant, 17-year-old A.D.T.,[1] was charged by petition with first degree rape. The State filed a motion to transfer the appellant to circuit court for prosecution as an adult. After a hearing, the Tuscaloosa Juvenile Court granted the State's motion and ordered the transfer. In this appeal from that order, the appellant contends that "the juvenile court's consideration of several factors under § 12-15-34(d) of the Alabama Code of 1975 lacked a rational basis"; that the juvenile court "displayed arbitrary and capricious reasoning"; and that these alleged shortcomings "led to a judgment that was clearly erroneous." Appellant's brief at 5.
"In order to transfer a juvenile, § 12-15-34 requires, first, that there be probable cause to believe that the child committed the offense alleged (a felony), and, second, at the dispositional phase of the hearing, that it is in the best interest of the child or the public to grant the motion to transfer." Ex parte J.R., 582 So.2d 444, 446-47 (Ala.) (Kennedy, J., dissenting from the quashing of a writ of certiorari), cert. denied, ___ U.S. ___, 112 S.Ct. 122, 116 L.Ed.2d 90 (1991). In reviewing the dispositional phase of a juvenile court's transfer order, this Court must determine whether the order to transfer is supported by "clear and convincing evidence." See id. at 449; A.W.M. v. State, 627 So.2d 1148, 1152 (Ala.Cr.App.1993); D.D.P. v. State, 595 So.2d 528, 536 (Ala.Cr.App.1991); O.M. v. State, 595 So.2d 514, 526 (Ala.Cr. App.1991), cert. quashed, 595 So.2d 528 (Ala. 1992).
The appellant's transfer hearing was conducted jointly with that of codefendant X.D. *167 At this hearing, the 15-year-old victim testified that she had attended a party with several friends on March 20, 1993. She stated that while she was talking to A.W., a male friend, in the bedroom of the apartment where the party was being held, four juveniles forced their way into the room. The victim identified three of these juveniles as X.D., Q.D., and the appellant. She stated that A.W. left the room with the juvenile whose name she did not know and that X.D., Q.D. and the appellant then forcibly removed her clothing. Although she "was saying for them to stop and [to] leave [her] alone," R. 17, the appellant and Q.D. held her down on the bed while X.D. had forcible intercourse with her.
The victim stated that the appellant said that he was next, and that, after an argument with Q.D., he "got on top of [her] and began trying to have sex with [her]." R. 19. However, A.W. and a female friend of the victim's came into the room and stopped him. The victim testified that the appellant did not have sex with her. She also denied on cross-examination that she had told the investigating officer that the appellant did have sex with her. She explained: "I said that [the appellant] tried to have sex with me. He probably did not hear what I said." R. 71.
Tuscaloosa County Deputy Sheriff Tommy Squires testified that hospital personnel who examined the victim after the incident "indicated that there was the presence of semen." R. 81. He also stated on cross-examination that the victim had told him that the appellant had had sex with her. Deputy Squires testified that X.D., after being informed of his juvenile rights, gave a statement in which he denied raping anyone. According to X.D.'s statement, he, Q.D., and another juvenile kicked down the bedroom door and saw A.W. having sex with the victim. Although Deputy Squires indicated that the appellant also made a statement, that statement was not introduced at the transfer hearing.
The appellant had been adjudicated delinquent on another charge and was on probation from that adjudication at the time of the instant offense. His probation officer, Phil Wilson, prepared the report required for the transfer hearing. See Ala.Code 1975, § 12-15-34(e). This report contains the following information:
"Extent and Nature of the Child's Prior Delinquent Record

"[A.D.T.] has three (3) prior petitions alleging delinquency in the Juvenile Court of Tuscaloosa County. Of these 3, one [charging third degree assault] has been adjudicated, one [also charging third degree assault] has been dismissed, and one [charging third degree theft] was disposed of by way of consent decree, which technically continues the case without adjudication, given certain terms and condition to be complied with....
"Past Treatment Efforts and Child's Response to Such Efforts

"On November 6, 1990, [A.D.T.] was charged with the theft of one package of cigarettes from A & P food store ($1.61 value of stolen merchandise). [A.D.T.] was given a consent decree on 1-31-91 for this offense. He was 14 years of age when this offense occurred. [A.D.T.] completed the six months' supervision by way of consent decree without further court intervention.
"On September 9, 1992, [A.D.T.] was charged with assaulting [C.P.] by hitting her in the face during a fight. As a result of this adjudication, [A.D.T.] was placed on formal probation with the Juvenile Court. As a condition of his probation, he was ordered to successfully complete the C.I.T.Y. [Community Intensive Treatment for Youth] Program. C.I.T.Y. is an alternative educational placement designed for those students who have trouble in the regular public school setting. During his C.I.T.Y. Program experience, he was alleged to have used drugs while on the school bus. However, this allegation was dismissed due to very weak evidence. The termination from C.I.T.Y. would have to be considered unsuccessful due to additional charges being filed while enrolled. The staff at C.I.T.Y. report that [A.D.T.'s] behavior and performance was mostly poor, with occasional good days.
"Demeanor

"[A.D.T.] is a physically average young man of 17. He has no physical characteristics which are of note. On the whole, he *168 has always been cooperative with this writer, and has always verbally expressed a desire to improve his behavior. However, his actions have not always been in conjunction with his verbiage. His relationship with his mother and other persons in authority is quite suspect. His mother regularly expresses to this writer her frustration with [A.D.T.'s] behavior.
""Extent and Nature of Child's Physical and Mental Maturity

"[A.D.T.'s] physical size, as mentioned above, is probably average for his age. He is approximately 5'6" tall and weighs 134 lbs. These figures were taken from the most recent physical examination given to [A.D.T.] while being detained in juvenile detention. To the knowledge of this writer, there has been no psychological testing done on [A.D.T.]. His formal status with the court has been so short that none has been necessary to this point. From an observational viewpoint, [A.D.T.] seems to have average intelligence, but performs below average due to his behavioral low functioning.
"Interest of the Community and of the Child Requiring/Not Requiring that the Child be Placed Under Legal Restraint or Discipline

"[A.D.T.] is a [17-] year-old black male who has been known to and supervised formally by the Juvenile Court of Tuscaloosa County since January 1993. Although he has been known to the court on matters not of a delinquent nature, his delinquent status is very short term. [A.D.T.] could be informally classified as a very `lucky young man,' as has been communicated to him by this writer. What is meant by that statement is that although his behavior and decision-making are most questionable, he has a knack for avoiding legal trouble. [A.D.T.] has experienced very little of what the Juvenile Justice System in Alabama has to offer, and, in the opinion of this writer, he should be given the opportunity to conform within the parameters of the system for which he qualifies, in terms of his age. Therefore, it is recommended that [A.D.T.'s] case be retained in the juvenile court for possible prosecution and disposition."
C.R. 17-18.
Wilson testified at the transfer hearing. He stated:
"[A.D.T.'s] status as a probationer would have to be considered marginal at best. He has continued to exhibit behaviors that are concerning to both his mother and to myself. The C.I.T.Y. Program experience would have to also be considered probably poor. The staff out there indicated to me that his attendance was poor and, during days when he did attend, they did have a number of problems with [A.D.T.]."
R. 102. When asked by the prosecutor if he had "received any information that [A.D.T.] is mentally retarded or mentally ill," Wilson responded, "No." R. 103. He also stated that he thought A.D.T. was "quite capable of understanding his actions and the things he does." Id. Wilson acknowledged that he "still" considered A.D.T. "a very lucky man as far as his knack for avoiding legal trouble." R. 106.
Wilson stated during direct examination that, in his opinion, A.D.T. should not be transferred to circuit court because "there are too many things left for the juvenile justice system to try and to give [A.D.T.] the opportunity to comply withwithin the parameters of the juvenile system." R. 105. He did not, however, specify what these "things" were. The juvenile judge later stated:
"I would like to hear your view, if you would expound a little more, on how you can rectify what appears to be violent conduct and an absolute disregard for authority figures, whether they be family figures or schools.... I want you to explain to me, if you will, how a 17-year-old with that kind of mind-set is going to be amenable to juvenile justice treatment at this point in his life."
R. 109-10. Although Wilson maintained that A.D.T. did at times comply with the rules established by his mother and by Wilson, he never answered the court's question as to how the juvenile justice system could rehabilitate A.D.T. Wilson also acknowledged in response to the court's questions that while *169 A.D.T. had "hounded" him about getting into the C.I.T.Y. Program, A.D.T. had "bomb[ed] out" of that program "because of his behavior." R. 112. The following also occurred during questioning by the court:
"THE COURT: Now, when you say he is lucky, ... I think the implication there is that he had been right on the edge and but for luck, he probably would have had several other petitions up here. Is that a fair way to interpret what you are saying?
"[MR. WILSON]: That's no secret, Your Honor, whatsoever. That's no secret at all. [A.D.T.] knows that and I have told him that.
"THE COURT: In other words, he has been associating with the wrong kind of folks in the wrong place at the wrong time. Is that a fair characterization of that?
"MR. WILSON: Yes, sir.
"....
"THE COURT: ... In your best judgment and opinion based on your experience as a probation officer, do you think that a psychologicalfull psychological evaluation of [A.D.T.] would bear any further light on reviewing his circumstances as far as emotions are concerned?
"MR. WILSON: Well, I'm not qualified to say, but in my best judgment, I'm not sure that it would. I'm not sure that we can learn
"THE COURT: It would not add or subtract to what you have already learned are the pertinent parts of his personality, demeanor, and character at this point?
"MR. WILSON: I would have to say again that, in my best judgment, probably not." R. 113-15.
Investigator Edward Vaughn of the Tuscaloosa Police Department also testified at the transfer hearing. He stated that he is "in charge" of the "Gang Suppression Unit" and that, in this position, he "investigate[s] gang crimes, gang related incidents," and "collect[s] intelligence on local gang members." R. 116. According to Investigator Vaughn, both A.D.T. and his codefendant X.D. "have claimed to be members of what is called the Insane Gangster Disciples," which is "a gang that originated in Chicago, Illinois, in the mid-70's to early 80's." R. 119-20. Vaughn defined a "gang banger" as a "hard core [gang] member" who "participates in every aspect of the gang activities." R. 119. He stated that "[A.D.T.] and [X.D.] are both what [he] consider[ed] to be gang bangers," R. 120, and he acknowledged that the "initiation of a male Disciple member could ... involve raping an unwilling female," R. 123.
At the conclusion of the testimony, the juvenile judge stated:
"[A.D.T.], I regret to tell you this, but I'm going to reject the probation officer's recommendation and I'm going to transfer you, ... and I'm going to tell you why. One thing that concerns me is your lack of effort and your attitude in the C.I.T.Y. Program. I think that's an indication to this court [of] a lack of desire on your part to rectify your behavior. This is, I notice, the third violent offense you have been charged with, however, one of those [was] dismissed. You have had assaultive behavior in your record, in other words, and rape is rather serious.
"I'm also taking into account the nature and the severity of this case. As far as I'm concerned, gang-related sexual misconduct, to include rape in particular, to me is a very serious offense. I think it's something you knowingly and willingly participated in. I do believe the testimony of Officer Vaughn that you have been identified in gangs with [X.D.] in this community. I have no reason to disbelieve that. I think your behavior in the community is marginal at best in that I don't think you have been amenable to authority, you were not able to sustain yourself in public school, you have not been very much under [the] control of your mother. I dare say she does not know who you are associating with. I don't think she knows when you go and when you come. I admit that some of my analysis of your behavior and your personality is somewhat speculative in that I don't follow you around, but I am supposed to use my basic intelligence and training and experience as a juvenile court judge these past ten years to try to understand a little bit more than just words on paper or the testimony of the witnesses in *170 this case. I quite agree that your past treatment efforts in juvenile court [have] been limited, but I would also note that if any of them are going to have any positive effect on you, the C.I.T.Y. Program would have been the least restrictive and probably the best opportunity you had to show what good these programs were going to do.
"Now, you are 17 years old. You are almost one month into your 17th year, which means that you have only 11 months to go before you are going to be 18.
"I'm also extremely concerned overall about the consequences of this conduct. Suppose this girl comes up pregnant and it turns out to be your child? That's another issue. This kind of sexual misconduct by older teenage boys in this community is not going to be tolerated by any segment of this community and it's no defense that you're poor, that you had a rough row to hoe in life because none of you can tell me in this courtroom, boys, that your mothers put you up to doing this or [that] they raised you to go out here and be lawbreakers. No probation officer has told me that you have mothers over here who could care less about you. I think it's just the other way around. I think they care a lot about you, but you really aren't listening to what they have to tell you. And consequently, you do what you want to do. You are charged with volitional conduct. That means you did something you wanted to do and there is probable cause to believe that you, in fact, did exactly what you are charged with. And there is no place for that conduct in this community. And I do not believe the juvenile court system, as it presently exists, based on my knowledge of the D.Y.S. system outside this communitythere is certainly nothing here in Tuscaloosa County except detentionI do not believe the juvenile court system is very effective in handling sexual assault cases as far as behavior modification is concerned.
"Now, don't look so puzzled up here at me, [A.D.T.]. There is a lot that's been going on in your life that's not even before this court. Your probation officer has told me that. You are just lucky you haven't already bit the dust, I guess, as far as juvenile court is concerned. And that's perfectly legitimate for me to consider as testimony in this case. Mr. Wilson is not lying about it. He knows you inside and out and he has tried to be helpful to you; he tried to give you good advice. He tried to help you do those things you should have done to keep yourself out of trouble. But both of you have some real clear indicators, in my experience and best judgment, of incorrigible behavior that it doesn't make any difference whether we send you to D.Y.S. or not, you are going to come back and commit another crime and be gone again to adult court most assuredly. But I'm not willing to spend another scarce dollar of juvenile justice funds on either one of you. You are too old. You are over the hill as far as I'm concerned, even though [A.D.T.] has not been in the system but very, very little." R. 168-73.
At the outset, we note that, although the matter is not contested in this appeal, the evidence introduced at the transfer hearing was clearly sufficient to establish probable cause to believe that A.D.T. committed the charged rape. See Biggs v. State, 331 So.2d 763, 764 (Ala.Cr.App.), cert. denied, 331 So.2d 765 (Ala.1976) ("[i]t is well established that a person present, aiding and abetting another in the commission of rape is guilty as a principal and punishable equally with the perpetrator of the crime").
Turning to the dispositional phase, we first observe that the juvenile court's written transfer order contains a statement that the court considered each of the six factors enumerated in Ala.Code 1975, § 12-15-34(d). Section 12-15-34(d) not only requires the juvenile court to consider each of the six factors enumerated therein in determining whether to transfer a juvenile, that section also requires the juvenile court to consider "other relevant factors." (Emphasis added.) However, that section "does not require that specific weights be assigned to different factors and circumstances." Williams v. State, 494 So.2d 887, 890 (Ala.Cr. App.1986). Consequently, the juvenile court may use its discretion in assigning "appropriate *171 weight to the six factors listed in § 12-15-34(d) as well as to other relevant circumstances." Id. Accord C.C. v. State, 586 So.2d 1018, 1022 (Ala.Cr.App.1991); Palmer v. State, 485 So.2d 1247, 1247-48 (Ala.Cr. App.1986).
It appears from the juvenile judge's statements at the transfer hearing that he weighed the nature of the offense heavily. However, it is clear that he correctly considered the circumstances of the offense and not just the nature thereof. See Ex parte J.D.G., 604 So.2d 378, 384 (Ala.1992) (Kennedy, J., dissenting from the quashing of a writ of certiorari) ("[t]he juvenile court should look to the facts underlying the offense to determine whether a transfer is warranted") (emphasis in original). It is equally as clear that the judge did not base the transfer order solely on the nature of the offense, see A.W.M. v. State, 627 So.2d at 1152 ("[t]he decision to transfer a juvenile for prosecution as an adult may not be based solely on the nature of the offense") (emphasis in original), but, instead considered each of the six statutory factors, as well as other relevant circumstances, as required by § 12-15-34(d).
A.D.T. appears to argue that the juvenile court improperly considered matters not contained in his delinquency record. However, there was no objection at the hearing to the court's questioning of Probation Officer Wilson in this regard, nor was there any objection to the court's statement that "[t]here is a lot that's been going on in your life that's not even before this court." Consequently, this particular issue was not properly preserved for our review. "Even in juvenile cases, proper and timely objections are required [to preserve an issue for appellate review]. See Ex parte Brown, 540 So.2d 740, 744-45 (Ala. 1989)." P.W. v. State, 625 So.2d 1207 (Ala. Cr.App.1993).
In this case, there was evidence that A.D.T. had committed a first degree rape, which is a serious offense, and evidence that he had prior charges of assaultive behavior, one of which he had been adjudicated delinquent upon. There was also evidence that the treatment effort for the prior adjudication had been largely unsuccessful and evidence that A.D.T. is a member of a gang. This evidence, considered in its totality, constitutes clear and convincing evidence to support the juvenile court's transfer order. See D.D.P. v. State, 595 So.2d at 539 ("[t]estimony regarding the seriousness of the offenses, the apparent inefficacy of [the juvenile's] past treatment efforts, and [the juvenile's] membership and ongoing recruitment efforts for his `gang,' met the clear and convincing evidence standard [necessary] to uphold th[e] transfer order"). Although A.D.T. makes much of the fact that his probation officer was of the opinion that he could benefit from remaining in the juvenile system and that the officer recommended that he not be transferred, a probation officer's recommendation is not binding on a juvenile judge. See Whisenant v. State, 466 So.2d 995, 998 (Ala.Cr. App.1984), reversed on other grounds, 466 So.2d 1006 (Ala.1985). "[A] juvenile court may properly order the transfer of [a] juvenile even where there is evidence that the juvenile would be `an excellent candidate for treatment and rehabilitation.'" B.L.S., 628 So.2d 1034, 1036 (Ala.Cr.App.1993). "[T]he juvenile court [i]s entitled to credit other evidence more strongly than the recommendation of [a probation officer]." D.D.P. v. State, 595 So.2d at 539. This is especially true in this case, where, as noted above, the probation officer never explained to the juvenile court specifically why he thought further juvenile justice treatment would benefit A.D.T. Furthermore, the juvenile judge specifically stated on the record his reasons for rejecting the probation officer's recommendation and the reasons he did not deem juvenile justice programs to be appropriate for A.D.T.
For the reasons stated above, the transfer order of the juvenile court is affirmed.
AFFIRMED.
All Judges concur.
NOTES
[1] The anonymity of the juvenile is preserved as required by Rule 52, A.R.App.P.